IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 675-2 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| ARTHUR FRIEDMAN | ) | |

## MEMORDANDUM OPINION AND ORDER

Defendant Arthur Friedman has filed a motion to dismiss the indictment. (R. 84.) For the following reasons, the Court denies his motion.

## BACKGROUND

Trial in this bank-fraud prosecution is set to begin in a matter of days. Friedman, however, seeks to dismiss the indictment and claims that his former lawyer's representation of a cooperating witness gives rise to a conflict that deprives him of constitutional rights.

### I. Procedural History

A grand jury returned an indictment against Friedman and his former business partner, Leon Bilis, on November 12, 2015. The indictment charged that the two men had committed bank fraud in violation of 18 U.S.C. § 1344, by submitting to banks fraudulent loan requests for automobiles leased by their business, Prestige Leasing, Inc. (R. 1.) Two attorneys, Michael D. Ettinger, and presently, Steven A. Greenberg, have represented Friedman in these proceedings. (R. 8; R. 44.) Jeffrey B. Steinback has represented Bilis. (R. 23.) On March 6, 2017, Bilis appeared before the Court and changed his plea from not guilty to guilty. The Court filed the plea agreement publicly on the case's docket on the same day. (R. 58.) As a part of his plea deal, Bilis is cooperating with the government. (*See id.* at 13.)

Friedman is scheduled to proceed to trial. In advance of trial, the government served on Friedman its witness list and a *Santiago* proffer requesting conditional admission of certain coconspirator statements. The witness list identified Bilis as the last of nineteen potential witnesses. The *Santiago* proffer sought to admit statements made by Bilis exclusively. (*See* R. 87.)

## II. Friedman's Motion to Dismiss

Federal Rule of Criminal Procedure 12(b)(1) allows a defendant to raise "by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). On March 11, 2018, Friedman filed a motion to dismiss the charges against him or, alternatively, to exclude Bilis's testimony at trial. (R. 84.) Friedman submits that the Court should dismiss the case because Steinback previously represented Friedman when the alleged scheme first began to unravel, rendering Steinback conflicted and making it "impossible" for Friedman to now receive a "fair trial."

Specifically, Friedman's motion claims that in 2011 he and Bilis "sought legal counsel" after the state "police began investigating them." They hired Steinback, who "agreed to represent the two" of them. During that representation, Steinback "acted on behalf of both" men, "attempting to quell a criminal investigation." Steinback met, according to Friedman's motion, with Friedman and Bilis "jointly" on more than one instance, and he also communicated solely with Friedman on occasion. From the two men, Steinback learned, "in detail, the facts and circumstances of the underlying conduct" now at issue in this prosecution. Steinback never advised the two on potential conflicts of interest. Sometime in 2012, Friedman ended his relationship with Steinback, and secured Ettinger's representation. Steinback continued to represent Bilis.

2

Friedman's motion argues that Steinback's dual representation created a plain conflict of interest for Steinback. According to the motion, because Bilis is now cooperating, Steinback's conflict has likely harmed Friedman in several ways—Steinback, for example, may have "subtly impart[ed]" to Bilis the confidences Friedman shared, or he may have "correct[ed] or question[ed]" Bilis based on information "shaped" by Friedman's disclosures. Friedman's motion further speculates that Steinback also may have prepared Bilis for his cooperation sessions with the government by turning Bilis's focus to Friedman's legal vulnerabilities, vulnerabilities into which Steinback had "unique insight." (R. 84 at 13–14.) Friedman also points to a November 3, 2011 interview the Buffalo Grove police conducted with Bilis, in which Bilis purportedly told the state police that he would "tak[e] full responsibility" and that Friedman was "fairly removed from the" alleged scheme. (R. 84 at 4 n. 2.) He argues that the fact that Bilis has since changed his story indicates that he has been "negative[ly]" affected by the conflict. (R. 92 at 9.) Friedman's briefs, however, do not describe what confidences he shared with Steinback, nor do they identify what confidences Bilis may have in turn shared with the government.

The government's response disputes most of Friedman's narrative. Based on discussions with Steinback, the government asserts that Steinback and Friedman met only once, and Bilis was also present. Friedman made "[n]o admissions" during that meeting, and "Friedman did not retain Steinback." Further, although there may have been additional, limited communications, Friedman never provided Steinback with "any admissions" or "privileged information." Soon after, according to the government, Steinback "informed" Friedman he would need to retain separate counsel. (R. 88 at 2 n. 1.)

3

**EVIDENTIARY HEARING**

To resolve these factual disputes, and in light of the Seventh Circuit law discussed below (*infra* at 15–17), the Court requested additional information regarding the alleged attorney-client relationship between Friedman and Steinback and held an evidentiary hearing on April 3, 2018.[1] During the hearing, the Court carefully evaluated the demeanor and credibility of each witness, including his body language, tone of voice, facial expressions, mannerisms, and other indicative factors. The Court summarizes below the testimony of both witnesses.

**I.    Steinback's Testimony**

Steinback testified on direct examination that in the fall of 2011, Bilis called him to set up a meeting. Bilis told him that he had a problem with his business, and wanted to speak with Steinback about it. They set up an appointment. Steinback initially believed, and testified, that the meeting took place at his former office in downtown Chicago; after the hearing, however, Steinback contacted the government and notified it that the meeting likely took place at a hotel in Rockford, Illinois. In any case, Steinback testified that both Bilis and Friedman attended the meeting. Steinback did not believe that, as of that meeting, he represented Bilis and Friedman personally.

---

[1] Because Friedman's motion implicates his potential confidences with Steinback, the Court also requested supplemental briefing on whether Friedman waived attorney-client privilege by filing his motion. Unsurprisingly, the government says yes, and Friedman says no. Neither party, however, identifies any on-point law. After the hearing, moreover, it is clear that the Court need not resolve the issue. In addition to permitting Friedman to submit materials *ex parte*, the Court closed the courtroom and held part of the hearing *ex parte* so as to allow Friedman to explore whatever he deemed necessary without risking privilege. The government did not object to either measure.

4

Steinback testified they talked about Prestige Leasing and potential issues regarding its outstanding loans.[2] They discussed potential civil actions pertaining to the loans, and Steinback hoped to keep the matter confined to civil disputes. Indeed, Steinback testified that during the meeting, neither Bilis nor Friedman admitted any criminal wrongdoing. Steinback also believed that the meeting occurred before the Buffalo Grove police had interviewed Bilis. Steinback left the meeting, he testified, believing that he would represent a "combination" of the company, Prestige Leasing, and Bilis and Friedman "in connection with their business." Steinback further testified that he told Bilis and Friedman he could represent them both "at this juncture," but if "things change[d]," they may have to retain separate counsel. Although he did not specifically recall telling them, he testified that per his common practice, he would have explained to them how clients' interests can diverge as a matter progresses. If they do, "then we will have to talk about a change in representation, someone else coming in for one or the other of you," he would have told them.

Confirming the arrangement, Steinback stated that he received one retainer check (for $30,000) from Prestige Leasing, which Bilis delivered. He continued to have ongoing discussions with Bilis about the matter, and spoke with Friedman one-on-one over the phone maybe one or two additional times. Friedman conveyed nothing substantive in those discussions, according to Steinback. Steinback, in fact, testified that Friedman never, at any point, admitted any wrongdoing with respect to the at-issue bank loans. Steinback also had ongoing joint communications with Bilis, Friedman, and Michael Kralovec, a lawyer who specializes in bank negotiations and regulatory matters and whom Steinback brought in to handle

---

[2] Out of caution for protecting privileges, and with the government's agreement, the government exited the courtroom as Steinback testified regarding information potentially governed by the attorney-client privilege. The Court addresses any potentially privileged testimony in a separately sealed addendum.

5

discussions with the banks. The communications submitted *ex parte*—reflecting joint emails among Bilis, Friedman, Steinback, and Kralovec—confirm that Kralovec negotiated with the banks on Bilis, Friedman, and Prestige Leasing's behalf. (*See* R. 99-5–99-8.) Later in his testimony, Steinback again confirmed that at no point did Friedman ever make an admission of fraud to him. He noted that, despite the passage of time, he would have remembered if a client—Friedman—had admitted wrongdoing to him. He also stated emphatically that he has never passed along information learned from Friedman to Bilis or the government.

Steinback testified on cross-examination that, at some point after Kralovec's unsuccessful negotiations with the banks, he realized his clients may have criminal exposure. He testified also that Bilis likely opened up to him directly about Prestige Leasing's bank dealings around the same period. Around January 2012, Friedman called Steinback to tell him that he had retained separate, individual counsel—Michael Ettinger. Ettinger later contacted Steinback to discuss legal fees, and Steinback agreed to write him a check for $5,000 on January 20, 2012, which came out of Steinback's unearned initial retainer. Steinback concluded his testimony by asserting that "Friedman was a client," and he did not believe that he would ever do anything "harmful" to a client, "past or present."

## II. Friedman's Testimony

Friedman also testified during the hearing. On direct examination, Friedman testified that he believed Steinback represented him from the fall of 2011 until January 2012, when he hired Ettinger. He testified that he met Steinback a total of three times in the fall of 2011. Each time, they met at a hotel in Rockford; once in the hotel's restaurant, and twice in the lobby. Each meeting was approximately two to two-and-a-half hours, according to Friedman. Friedman's counsel never elicited, and Friedman never testified on direct, that he made any admissions to

6

Steinback or shared with him any confidences about the alleged fraud.

On cross-examination, Friedman admitted that Bilis was present for each meeting with Steinback. Friedman also testified, however, that during each meeting, Bilis took an extended bathroom break lasting approximately ten to fifteen minutes. Friedman generally could not recall when during the meetings the bathroom breaks occurred, but he testified that during Bilis's trips to the bathroom, he continued to speak with Steinback about "the matter." He initially testified that he spoke with Steinback while Bilis was in the bathroom because Steinback's representation was too "expensive" to make small talk. When Bilis returned, the conversations would "continue[ ]," although Friedman did not recall whether Bilis asked to be filled in on their conversation.

As cross-examination continued, Friedman later testified that, during Bilis's bathroom breaks, he would tell Steinback "certain things" that he did not want to reveal in from of Bilis. Friedman stated that he would wait for Bilis to go the bathroom so that he could tell Steinback "things" he did not want Bilis to hear. When the government asked whether those statements in Bilis's absences had anything to do with the alleged fraud, Friedman responded, "in a way." When the government asked whether those statements had anything to do with what Friedman did in the alleged fraud, Friedman responded, "yes."[3] Friedman could not recall if the statements he made were similar or different statements during each of Bilis's three absences. He also could not recall whether Bilis independently knew of the facts he discussed with Steinback while Bilis was away.

In addition, Friedman added that he made these statements to Steinback—statements which he did not want revealed to Bilis—during Bilis's trips to the bathroom because he was

---

[3] Friedman's counsel did not object to this line of questioning, and it was consistent with Friedman's apparent approach that the fact of a statement to counsel was not privileged, but the substance was.

"there" with Steinback. He testified that, despite the apparent sensitive nature of these statements, he never called Steinback to discuss them without Bilis, nor did he arrange a one-on-one meeting with Steinback. Instead, he simply conveyed them during Bilis's bathroom breaks. When the government pressed as to why Friedman would risk sharing information he believed to be sensitive at a hotel and during Bilis's bathroom breaks, Friedman responded that he likes to "talk in person, not on the phone," and so when he saw Steinback, he talked to him. Friedman also testified that he did not recall asking Steinback not to share these statements with Bilis.

Friedman testified further on cross-examination that he believed he entered into "joint" representation with Bilis because they were working together to resolve the bank-related issues. He also testified that he had reviewed discovery in this matter, including the FBI reports drafted after Bilis's proffers with the government.

### III. Steinback's Client File

Finally, as ordered, Steinback brought with him to the hearing his client case file relating to this matter. With Bilis's and Friedman's consent, the Court has reviewed the file *ex parte*. That file did not contain an engagement letter. Moreover, nothing in that file showed that Friedman ever provided substantive information relating to the alleged fraud to Steinback, nor showed that Steinback ever passed along any information he learned from Friedman to Bilis or the government.

## FACTUAL FINDINGS

Having reviewed the evidence, listened to the testimony, observed the witnesses, and evaluated their credibility, the Court makes the following determinations. First, as to representation, Steinback represented Friedman from the fall of 2011 until January 2012. Steinback represented Friedman jointly with Bilis and their company, Prestige Leasing. The

8

evidence establishes that Steinback informed Bilis and Friedman that the representation was joint, and that they may eventually require separate counsel if their interests conflict. The representation of Friedman initially covered ongoing disputes with the banks over the outstanding loans. Given that Buffalo Grove police officers interviewed Bilis in November 2011, and given that Steinback's representation persisted, the representation later expanded to concerns about criminal exposure. Steinback never represented Friedman in the federal government's investigation into the loans, which well postdates his representation.

Second, the Court finds that Friedman did not make any admissions of criminal wrongdoing to Steinback. Steinback testified emphatically to as much. Although Steinback demonstrated poor recall regarding dates, locations, and instances of meetings with Bilis and Friedman, Steinback—an able, experienced criminal-defense attorney—credibly testified that he recalled Friedman had made no such admission.[4] He testified further that, in his substantial experience, he would have recalled if a client had. The lack of evidence in his client file suggesting that Friedman made confidential admissions supports his testimony.

The Court does not find Friedman's testimony that he shared confidences with Steinback about the alleged fraud credible. Such a fact is material to Friedman's motion, yet Friedman did not testify to it on direct examination or offer it into evidence through his motion or *ex parte*. Friedman, moreover, initially testified that he continued to discuss the "matter" with Steinback when Bilis went to the bathroom because Steinback was too expensive to make idle conversation with. But he later testified that he awaited Bilis's routine bathroom breaks to share those statements with Steinback because Friedman did not want Bilis to hear them. He conceded during cross-examination that this was a "change[ ]" in his testimony. At any rate, that a

---

[4] Steinback was forthcoming while on the stand, even expressing regret about the notion that he would ever do something to harm a client. The Court finds his testimony credible.

9

criminal defendant—apparently concerned with his individual criminal exposure and desirous of keeping that concern from his business partner—would enter into joint representation with that business partner, and then await inherently unpredictable bathroom breaks to provide his lawyer with critical information (rather than calling him or meeting with him one-on-one) breaks the Court's credulity. The unlikelihood that Friedman shared personal confidences during Bilis's bathroom breaks is further supported by his testimony that he did not recall asking Steinback to keep those confidences to himself and away from Bilis, with whom, again, Friedman entered into joint representation.

Third, even if Friedman shared personal confidences about his wrongdoing solely with Steinback, Steinback did not pass that information to Bilis. Steinback testified that he never transmitted any information from Friedman to Bilis. No evidence suggests the contrary. In fact, Friedman testified that he read the government's reports on Bilis's proffers—yet in his briefs, on redirect, or *ex parte*, Friedman did not identify *any* similarities between what was contained in those reports and what he supposedly shared with Steinback in confidence.

## ANALYSIS

Friedman's motion to dismiss raises the question: If a lawyer jointly represented two individuals facing civil and state-police inquiries, ended his representation of one of those clients, and years later, in a federal prosecution arising out of the same facts, represents his remaining client in cooperating and eventually testifying against his former client, have the former client's constitutional rights been infringed? Friedman's arguments address two concerns: one, that Steinback's previous representation and alleged conflict have violated his right to effective counsel; and two, that Steinback's alleged conflict and Bilis's cooperation have deprived him of his due process right to a fair trial. Neither concern is warranted. The Court

concludes that the answer to Friedman's question is, in this case, no.[5]

**I.      Sixth Amendment Right to Counsel**

Most of Friedman's cited authority pertains to the Sixth Amendment right to counsel. (*See, e.g.*, R. 84 at 3, 6, 11; R. 92 at 7–9.)  The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. CONST. amend. VI.  "The core of this right has historically been, and remains today, 'the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial.'" *Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (quoting *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)); *see also Wheat v. United States*, 486 U.S. 153, 159–160 (1988) (because "an unaided layman may have little skill in arguing the law or in coping with an intricate procedural system," the "essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant").

The Supreme Court has long held that the right to counsel protects criminal defendants from conflicted representation.  *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978); *see also, e.g.*, *United States v. Lewisbey*, 843 F.3d 653, 657 (7th Cir. 2016).  As it first concluded, in *Glasser v. United States*, the right to counsel "contemplates that such assistance be untrammeled and unimpaired" by a lawyer who must "simultaneously represent conflicting interests."  315 U.S. 60, 70 (1942).  Stated more simply, "the Sixth Amendment right to effective assistance of counsel encompasses 'a correlative right to representation that is free from conflicts of interest.'"  *Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)).

---

[5] The government contends that Friedman's motion is untimely and lacks good cause under Rule 12. Because the Court disposes of the motion on other grounds, it need not address that contention.

11

The right to counsel is not ubiquitous, however, and Steinback's conduct has not impinged Friedman's constitutional guarantee. *Accord Texas v. Cobb*, 532 U.S. 162, 168, 171–72 (2001). Friedman's claim, for one, "overlooks the basic principle that a Sixth Amendment ineffective-assistance-of-counsel claim is viable only *after* the right to counsel attaches." *United States v. Stadfeld*, 689 F.3d 705, 711 (7th Cir. 2012) (emphasis in original). As the Supreme Court has made clear, the right to counsel "does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) (citations and internal quotations omitted); *see also United States v. Muhammad*, 502 F.3d 646, 657 n. 6 (7th Cir. 2007).[6] Here, Steinback represented Friedman "long before" the government instituted proceedings against Friedman and Bilis.[7] *Stadfeld*, 689 F.3d at 711. Friedman thus has no right-to-counsel claim based on Steinback's conduct. *See United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (*White I*) ("White argues that the use of documents obtained from his (former) attorney infringed his Sixth Amendment right to counsel. This argument has no merit, because [his former lawyer] was not representing White in the criminal matter and because that matter had not yet proceeded from the investigative to the accusatorial stage."); *United States v. Haywood*, No. 14 C 9107, 2015 WL 5006003, at *2 (N.D. Ill. Aug. 19, 2015) (criminal defendant did not have an right-to-counsel claim based on pre-adversarial proceedings conduct); *see also Moss v. United States*, 323 F.3d 445, 470 (6th Cir.

---

[6] This case does not implicate the Fifth Amendment right to counsel during interrogations, as there is no evidence that state police ever detained and interrogated Friedman. Moreover, Friedman had no Sixth Amendment right to counsel during the state investigation because no evidence presented suggests that investigation reached the institution of criminal proceedings.

[7] Also for that reason, there are no grounds to conclude that the government interfered with Friedman's right to counsel by infiltrating the defense team's strategy—there is no evidence that there was a defense team near Bilis's cooperation. *See United States v. Barret*, 848 F.3d 524, 533 (2d Cir. 2017) (citing *Massiah v. United States*, 377 U.S. 201 (1964)).

2003) (petitioner's claim suffered from a "patent deficiency" in arguing that a lawyer's conflict adversely affected him only after the lawyer's representation ended).

Implicit in that conclusion, and just as fatal, is the fact that Friedman cannot advance someone else's claim of ineffective assistance. "Sixth Amendment rights are at bottom *personal* to the accused." *United States v. Blair*, 661 F.3d 755, 772 (4th Cir. 2011) (emphasis in original); *see also Cobb*, 532 U.S. at 171 n. 2 ("The Sixth Amendment right to counsel is personal to the defendant and specific to the offense."); *United States v. Dobson*, 626 F. App'x 117, 123 (6th Cir. 2015) (same). It is therefore "well established . . . that a defendant lacks standing to challenge the effectiveness of his codefendant's trial counsel." *United States v. Rondon*, 204 F.3d 376, 379 n. 2 (2th Cir. 2000); *see also, e.g.*, *United States v. Johnson*, 267 F.3d 376, 380 (5th Cir. 2001) (party lacks standing to raise ineffective-assistance claims belonging to codefendant). Friedman, here, makes much of Steinback's supposed conflict in representing Bilis. But that conflict, even if actual, does not create a claim for Friedman. *See, e.g.*, *United States v. Davis*, 612 F. App'x 526, 527 (10th Cir. 2015) ("Defendant's roundabout approach" to claiming a right-to-counsel violation "fails. Defendant has no 'standing' to assert a violation of [another's] Sixth Amendment right to counsel")). To the extent that conflict, again even if actual, creates a presumption of prejudice offending the Sixth Amendment, *see, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 692 (1984) ("prejudice is presumed when counsel is burdened by an actual conflict of interest"), it is prejudice that Bilis suffers, not Friedman.[8] *Accord United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995) (one codefendant may not "vicariously assert" another codefendant's Sixth Amendment rights); *United States ex rel. Stewart v. Redman*, 470 F.

---

[8] The Court intends to address the potential conflict Steinback has in representing Bilis with Bilis.

Supp. 50, 52 (D. Del. 1979) ("Even if any deprivation of [one person's] Sixth Amendment rights occurred, petitioner [ ] would not have standing to complain of that deprivation vicariously, even if, as is undisputed, that violation led directly to [petitioner's] arrest.").

Friedman has been represented by unconflicted lawyers of his choice—not Steinback—throughout this proceeding. As the Sixth Circuit held in a similar circumstance, while a defendant may make much of his former lawyer's conflict in representing a cooperating witness against him, "there [is] no Sixth Amendment" problem, because the former lawyer "was not [defendant's] counsel in the federal action and [his subsequent lawyer], who was, had no conflict." *McNeal v. United States*, 17 F. App'x 258, 265 (6th Cir. 2001). Friedman cites no law holding otherwise, and the Court is aware of none. *See McNeal*, 17 F. App'x at 263 ("we can find no authority for the proposition that the Sixth Amendment right to counsel" extends to such circumstances).

## II. Due Process Right to a Fair Trial

Friedman also cites his rights to due process and a fair trial. The Fifth Amendment guarantees "due process" of law, the essence of which is "fundamental fairness." *United States ex rel. Crist v. Lane*, 745 F.2d 476, 482 (7th Cir. 1984). "A trial is fundamentally fair if it results in a verdict reached through consideration of evidence properly admitted and which is untainted by improper influences." *Id.* "[T]he Constitution entitles the criminal defendant to a fair trial, not a perfect one." *United States v. Adams*, 628 F.3d 407, 419 (7th Cir. 2010).

Friedman submits that this Court must presume that he has been prejudiced as a result of Steinback's purportedly ongoing conflict. In arguing as much, however, Friedman cites only to cases concerning the presumed prejudice to a criminal defendant whose Sixth Amendment right to counsel may be infringed by his actually conflicted lawyer. (*See, e.g.*, R. 84 at 3 (citing

14

*Holloway*, 435 U.S. 475), at 6 (citing *Glasser*, 315 U.S. 60; *Cuyler*, 446 U.S. 335; *United States v. Cronic*, 466 U.S. 648 (1984)), at 12 (citing *People v. Thomas*, 545 N.E.2d 654 (1989)); R. 92 at 9 (citing *United States v. Turner*, 594 F.3d 946 (7th Cir. 2010)), at 12 (citing *United States v. Basham*, 918 F. Supp. 2d 787 (C.D. Ill. 2013); R. 101 at 4–5 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)).) In those cases, a presumption makes sense; "it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests" in assessing ineffectiveness. *Strickland*, 466 U.S. at 692.

But the question here is not whether a conflict has rendered Friedman's lawyer ineffective, for the reasons explained above. *See, e.g.*, *Johnson*, 267 F.3d at 380; *McNeal*, 17 F. App'x at 265. It is, instead, whether his former lawyer's representation of a codefendant-turned-cooperator infects the prosecution and trial with legally protected confidences so as to deprive Friedman of his due process right to a fair trial. Friedman acknowledges as much, in contending that the Court should dismiss all charges because "[t]he taint of Steinback's violation of privilege permeates throughout this case." (R. 84 at 17; *see also, e.g.*, R. 98 at 1 ("A breach of Mr. Friedman's privilege has infected this trial.").)

The Seventh Circuit has addressed a similar question. In *White I*, a bankruptcy lawyer agreed, after being convicted for fraud himself in an unrelated matter, to assist the government in its bankruptcy-fraud prosecution of his former clients. 879 F.2d at 1510–11. On an initial appeal, a defendant raised arguments similar to Friedman's here—namely, that his former lawyer's cooperation with the government violated his Sixth Amendment right to counsel and his Fifth Amendment right to due process. *Id.* at 1513. The court rejected the right-to-counsel argument, as cited above, because the lawyer "was not representing" the defendant "in the criminal matter" at "the accusatorial stage." *Id.* But it entertained the due process argument.

15

The Seventh Circuit noted, if the government "extracts" from a former lawyer "secrets that it then uses in a criminal trial of the client to the latter's substantial prejudice, this *might* be the kind of serious governmental misconduct that would violate a criminal defendant's rights under the due process clause of the Fifth Amendment." *Id.* (emphasis in original). The court, however, decided that it could not resolve that constitutional issue without knowing "first, whether the government procured or was otherwise complicit in a violation of the attorney-client privilege, and second, if so, whether the violation resulted in the introduction of evidence sufficiently material and adverse to [the defendant] that the failure to exclude it denied him basic procedural rights." *Id.* at 1514.

On remand, the district court held an evidentiary hearing. That hearing revealed, in brief, that the lawyer agreed to cooperate against his former clients and share "nonprivileged information." *United States v. White*, 950 F.2d 426, 428 (7th Cir. 1991) (*White II*). He initially provided factual background and details of the defendant's company to the government; later, he produced certain client files, including pertinent bankruptcy schedules, mortgage releases, and notes. *Id.* at 428–29. He also testified before a grand jury regarding his handling of the defendant's bankruptcy. *Id.* at 429.

On the second appeal, the Seventh Circuit agreed with the district court that the defendant "did not carry his burden of proving that any specified information in the documents was privileged." *Id.* at 431. It held that "there is no specification as to what information [the defendant] gave [his former lawyer] for which [the defendant] had an expectation of confidentiality." *Id.* at 430. The court also held that even if the produced documents were privileged, there was no evidence that the government was "complicit" in securing them. *Id.* at 431. As a result, the Seventh Circuit affirmed the district court's decision that the lawyer's

16

cooperation did not infringe on the defendant's right to due process. *Id.* at 431–32.

Since *White II*, other courts have echoed that for the potential breach of privilege to violate a defendant's due process rights, there must be evidence that the privileged information may be used against the defendant. *See United States v. White*, 970 F.2d 328, 336 (7th Cir. 1992) (*White III*) (in a related appeal, holding, "[s]ince the evidence that the government introduced to convict [the defendants] did not stem directly or indirectly from any information that [the lawyer] provided, [they] suffered no prejudice at trial from any possible breach of the attorney-client privilege"); *United States v. Castillo*, 621 F. Supp. 2d 760, 763 (D. Ariz. 2008) ("even if Movant's counsel disclosed confidential communications to the Government, Movant makes no showing that these communications were introduced at trial"). In *United States v. Coffman*, for example, the Sixth Circuit held that a defendant could not "prevail" on his due process claim because there was no evidence that the "Government made 'direct use of the privileged communications, either at trial or before the grand jury,' to show prejudice."[9] 574 F. App'x 541, 565 (6th Cir. 2014) (quoting *United States v. Warshak*, 631 F.3d 266, 294–95 (6th Cir. 2010)); *see also United States v. Damico*, No. 94 CR 723, 1995 WL 221883, at *9 (N.D. Ill. Apr. 10, 1995) ("there is no evidence of government complicity, even if there were a determination that the attorney-client privilege was violated. . . . Even assuming the government's complicity in violating the attorney-client privilege, Dote has not presented

---

[9] Nowhere in Friedman's many briefs does he argue that Steinback's alleged conflict tainted the grand-jury proceedings, and he did not bring his motion under Rule 12(b)(3)(A)(v). Even if he had, neither party presented evidence showing that Bilis testified before the grand jury. Even if they had, a district court "may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *United States v. Brooks*, 125 F.3d 484, 497 (7th Cir. 1997) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988)); *see also United States v. Vincent*, 416 F.3d 593, 600 (7th Cir. 2005). "'Prejudice' only occurs 'when the alleged violation had a substantial effect on the grand jury's decision to indict or when it was quite doubtful that the decision to indict was free from that violation's considerable influence.'" *United States v. Khan*, No. 15-CR-00286, 2017 WL 2362572, at *17 (N.D. Ill. May 31, 2017) (quoting *Brooks*, 125 F.3d at 498). There is no evidence of such prejudice here, as discussed at greater length below. *See White II*, 950 F.2d at 429–431.

persuasive evidence of prejudice to warrant dismissal of the indictment.").

A related line of Seventh Circuit decisions underscores the point. In *United States v. Thomas*, the court held that allowing the trial testimony of a recently pleaded codefendant—who "had participated in the pre-trial defense planning with [the on-trial codefendants] as a defendant and was therefore aware of privileged conversations and strategies"—was not error. 774 F.2d 807, 809 (7th Cir. 1985). The Seventh Circuit stated that the defendants provided no specifics "as to how they were prejudiced" by the testimony, and there was "no evidence any confidences from the [pretrial strategy] sessions were revealed by the [codefendant] on the witness stand or that his testimony was formulated with any pretrial strategies of the defendants taken into account." *Id.* at 809–810. The court also found important the fact that the district court provided the jury with a proper "cautionary instruction" as to the codefendant's testimony. *Id.* In *United States v. Olson*, the Seventh Circuit repeated its holding in *Thomas*, ruling that a codefendant-turned-cooperator may testify—despite his participation in joint-defense "privileged conversations and strategies"—as long as his testimony is admitted for "limited" and proper purposes, and the district court provides a proper cautionary instruction. 450 F.3d 655, 678 (7th Cir. 2006); *see also Barret*, 848 F.3d at 532–533 (adopting *Thomas*, and holding that a codefendant may testify as long as his testimony is "admitted only for the limited purpose of testifying to events other than the witness's involvement in joint defense planning" and the jury receives proper cautionary instructions).

Setting aside Friedman's speculation about a potential parade of horribles, there is no evidence that Steinback's purported conflict or Bilis's cooperation have unfairly prejudiced Friedman. Steinback did not represent Friedman individually, but jointly, and during ongoing bank disputes and at the nascence of a state-police inquiry. More importantly, the evidence

indicates that Friedman did not provide Steinback with any personal, privileged confidences. Even if he had, Steinback credibly testified that he never shared anything he learned independently from Friedman with Bilis. Friedman's salient testimony was not credible, and he failed to identify anything in the government's discovery—including reports of Bilis's proffers—suggesting that Bilis (or Steinback) shared with the government anything he supposedly told Steinback in confidence.

"[M]ultiple representation itself is not presumptively prejudicial," and absent prejudice, the Court cannot conclude that Steinback's representation of Bilis leads to "fundamentally unfair" trial. *McNeal*, 17 F. App'x at 264 (citing *Holloway*, 435 U.S. at 482). The Court, therefore, denies the motion to dismiss the case. *See United States v. Morrison*, 449 U.S. 361, 365 (1981) ("absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate"). Nor will the Court exclude Bilis's testimony. Consistent with the Seventh Circuit's decisions in *Thomas* and *Olson*, it will provide the jury proper cautionary instructions to limit any risk of potential prejudice.

## CONCLUSION

For the foregoing reasons, the Court denies Friedman's motion to dismiss. Trial begins as scheduled on April 10, 2018.

**DATED: April 6, 2018**  **ENTERED**

*/s/ Amy J. St. Eve*

**AMY J. ST. EVE**
**U.S. District Court Judge**