**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 15 CR 675-2 |
| v. | ) | |
| | ) | Hon. Amy J. St. Eve |
| ARTHUR FRIEDMAN | ) | |

## MEMORDANDUM OPINION AND ORDER

AMY J. ST. EVE, Circuit Judge[*]:

On April 17, 2018, a jury convicted defendant Arthur Friedman on three of five counts of bank fraud, 18 U.S.C. § 1344. Friedman has filed a post-trial motion for a judgment of acquittal and an alternative motion for a new trial. (R. 124.) For the following reasons, the Court denies his motions.

## BACKGROUND

### I.    Pretrial Proceedings

On November 12, 2015, a grand jury returned an indictment charging Friedman and Leon Bilis, co-owners of an automobile-leasing company named Prestige Leasing, with bank fraud. The indictment charged that from 2008 until November 2011 Bilis and Friedman schemed to defraud banks by submitting fraudulent loan applications for customers who had not actually purchased cars. In some instances, the vehicles that Bilis and Friedman claimed had been sold to a customer had already been exported overseas. Bilis and Friedman submitted these fraudulent applications, according to the indictment, to inflate Prestige's operating capital. On March 6, 2017, Bilis pleaded guilty pursuant to a written plea agreement, which contained a cooperation

---

[*] Sitting by designation (R. 133).

provision. (R. 58.) Friedman proceeded to trial.

On March 16, 2018, less than a month before trial was scheduled to begin, Friedman filed a motion to dismiss the indictment. (R. 84.) He claimed that in late 2011, when the banks first came calling for unpaid loans, Bilis and he hired a lawyer named Jeffrey Steinback. Not long after, Friedman claimed, he obtained independent counsel, but Steinback continued to represent Bilis. Based on their prior attorney-client relationship, Friedman argued that Steinback's representation of his codefendant-turned-cooperator, Bilis, prejudiced his right to a fair trial. The Court held an evidentiary hearing on the matter and it reviewed evidence submitted *ex parte*. The Court concluded that there was no risk of prejudice against Friedman, and therefore denied his motion on April 6, 2018. (R. 107 (the "April Opinion").)[1]

## II.   Trial and Jury Verdict

The government went to trial on a redacted indictment, which charged five counts of bank fraud in violation of 18 U.S.C. § 1344. Counts One and Two related to two loans submitted to U.S. Bank and American Eagle Bank in the name of Aleksandr Petlakh, a Prestige employee. Counts Three and Four related to two loans submitted to American Eagle Bank and MB Financial Bank in the name of Daniel Krasilovsky, Friedman's cousin. Count Five related to a loan submitted to American Eagle Bank in the name of Michael Blekhman, a former Prestige customer. At trial, the government called the following witnesses: Alina Sandal, Leon Bilis, Andray Zdunkevich, Jerry Sklarzewski, Val Himin, Petlakh, Vassily Larchenko, Stanislaw Podolny, Krasilovsky, Igor Nemov, Brian Landers, Special Agent David Malone, Alex Troyanovsky, Alex Zdanov, Kay Pollock, and Barry Kreczmer. Friedman called one witness, Buffalo Grove Police Lieutenant Tara Anderson. Friedman did not testify at trial.

---

[1] The Court presumes familiarity with the April Opinion.

During trial, Bilis testified that many customers needed loans to purchase cars from Prestige, and that Prestige had relationships with several banks to facilitate those loans. Prestige would submit the customer's personal information, information about the sale and the vehicle, and, after a credit-report check, Prestige would receive the funds and the customer would be obligated to repay the bank. The banks relied on Prestige's representations about the customer, sale, and location of the vehicle in deciding to issue loans, according to testimony.

Bilis testified that in 2008 Prestige began to suffer financially, and at that time Friedman proposed submitting several fraudulent loan applications in Bilis's and Friedman's own names for vehicles that had already been exported. Bilis testified that to conceal the fraud Prestige would make monthly payments on those loans. The government introduced loan applications in Friedman's and Bilis's names which they had submitted to banks, and vehicle reports showing that those vehicles had already been exported overseas before Bilis and Friedman had submitted those loans. The government also elicited the testimony of Prestige's accounts-payable manager, Alina Sandal, who explained that she created monthly financial statements that showed the company's profits and losses. She testified that Friedman received and reviewed those statements.

Bilis further testified that Prestige continued its financial decline past 2008. Bilis and Friedman began using the names of other individuals—family, friends, and Prestige employees—to take out fraudulent loans. The government introduced evidence of loans in the name Friedman's father and cousin as well as certain Prestige employees. Many of those loans were for cars that were not in the country, according to vehicle reports. Bank records, further, showed that these supposed customers did not repay the loans; Prestige did.

Certain of the supposed customers testified, each explaining that he did not authorize the

loan applications, receive the vehicle identified in the application, or receive the loan proceeds. Friedman's cousin, Daniel Krasilovsky, for example, testified (after receiving immunity from the government) that Friedman had requested his driver's license so that Friedman could take out loans. Shortly after, according to Krasilovsky, he began receiving payment books, which Friedman told him to disregard. Krasilovsky testified that when the bank pressed for information Friedman told him to go to the police.

Bilis also testified that by 2011 Prestige's financial situation had still not measurably improved, and he and Friedman grew more desperate to increase the company's capital. One customer, Stanislav Podolny, testified that he provided Prestige cash for a car that he did not receive. Floor-plan investors, who financed vehicles to be marketed and sold on Prestige's lot in exchange for a cut of the mark-up price, testified similarly. Igor Nemov, for example, testified that he invested substantial sums, but he later found out that Prestige did not have many of the cars he had financed.

The government's evidence showed that by 2011 the banks began contacting the customers whose names appeared on fraudulent applications regarding outstanding payments. One supposed customer and Prestige employee, Petlakh, explained that when he confronted Friedman and Bilis, both men apologized to him. Similarly, three American Eagle Bank representatives—Andray Zdunkevich, Jerry Sklarzewski, and Barry Kreczmer—testified that after receiving word that some of the loans may have been fraudulent, they investigated, and determined that several Prestige loans were suspect and delinquent. They confronted Friedman and Bilis, who admitted that they had applied for loans based on fictitious sales.

When the government rested its evidentiary presentation, Friedman called Lt. Tara Anderson. Lt. Anderson testified regarding her initial investigation of fraud at Prestige, which

she later referred to the FBI. Friedman also used Lt. Anderson to impeach certain witnesses based on potentially inconsistent statements those witnesses had previously made to her. The Court, however, sustained objections to Friedman's attempted impeachments with respect to Nemov's and Podolny's testimonies.

After hearing the evidence, the parties' arguments, and the Court's instructions, the jury found Friedman not guilty on Counts One and Two and guilty on Counts Three, Four, and Five.

## ANALYSIS

Friedman brings a motion for acquittal under Federal Rule of Criminal Procedure 29 or, in the alternative, a motion for a new trial under Federal Rule of Criminal Procedure 33. The Court addresses these motions in turn.

### I. The Court Denies Friedman's Motion for Acquittal Under Rule 29

Rule 29 governs motions for a judgment of acquittal. Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). Where, as here, a defendant makes a Rule 29(a) motion after the government's case and the court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." FED. R. CRIM. P. 29(b).[2]

"A motion for acquittal should be granted only where the evidence is insufficient to

---

[2] The government submits that Friedman's motion is subject to Rule 29(c), which requires a court to consider the entire trial record. That rule governs when a defendant makes a motion after a jury verdict, but here, Friedman orally made a motion immediately after the government's presentation concluded, which the Court took under advisement. The difference is inconsequential though, because neither party's arguments touch on the only evidence Friedman presented after the government rested (namely, Lt. Anderson's testimony).

sustain a conviction." *United States v. Kohli*, 847 F.3d 483, 489 (7th Cir. 2017) (quotation and citation omitted). A court will overturn the jury's verdict only if, "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (quoting *United States v. Campbell*, 770 F.3d 556, 571–72 (7th Cir. 2014)); *see also United States v. Wilson*, 879 F.3d 795, 802 (7th Cir. 2018); *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009). A defendant bears the burden to "convince" the court that "no rational trier of fact could have found him guilty." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010) (quoting *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009)). It is a "heavy" burden—indeed a "nearly insurmountable" one. *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018).

A.     **The Government Presented Sufficient Evidence to Convict on Counts 3 and 4**

Friedman challenges the sufficiency of the evidence regarding Counts 3 and 4, which relate to loans taken out in the name of Krasilovsky, Friedman's cousin. Friedman argues that the government's proof rested solely on Krasilovsky's unreliable and inconsistent testimony.

The government produced more than enough evidence to convict Friedman on Counts 3 and 4. Before Krasilovsky's testimony, the government elicited Bilis's testimony, which described the scheme in detail, including its execution and Friedman's involvement. Bilis specifically identified the Krasilovsky loans as fraudulent. He explained that Krasilovsky never purchased the vehicles for which the loans were received, that Prestige had actually exported them before seeking the loans, and that Friedman made the payments on the loans.

Krasilovsky confirmed those facts with greater detail. He explained that he had never purchased a car from Prestige, and that in 2010, at a barbeque at Friedman's home, Friedman

asked him for help opening a few loans. A few days later, Friedman followed up on his request. He called Krasilovsky and asked whether Krasilovsky would help him take out a loan. Krasilovsky said yes, and then provided Friedman with his driver's license and social security number. About a month later, Krasilovsky received payment books in the mail for two cars he did not buy. Krasilovsky called Friedman, who told Krasilovsky that he would make the payments on the car loans. The next year, in 2011, the banks called Krasilovsky to inform him that loans in his name had outstanding obligations. Krasilovsky then called Friedman for an explanation. Friedman told him that he was closing Prestige and that Krasilovsky should go to the police department and file a report, for the sake of Krasilovsky's credit score. The government then asked Krasilovsky to review the loan applications relating to Counts 3 and 4, and he confirmed that he had not made or signed for either loan, had not purchased the cars, and had not received the loan proceeds.

Friedman, correctly, does not argue that this testimonial evidence was insufficient to convict him in its own right. Instead, he contends that Krasilovsky's testimony was unreliable and inconsistent, and so "the Court need not defer to the jury's credibility finding." (R. 136 at 5.) He cites, for example, the fact that Krasilovsky had not mentioned a discussion about the payment books or a barbeque meeting to the state police. Indeed, Friedman submits, the likelihood of the barbeque meeting is suspect given that Prestige took the loans out in February (so the barbeque was sometime in the winter), and that only two people (Friedman and Krasilovsky) attended. Friedman also contends that Krasilovsky had reason to lie on the stand, because he needed to curry the government's favor in exchange for immunity.

Friedman's challenge to Krasilovsky's credibility founders on the well-established rule that "it is the exclusive function of the jury to determine the credibility of witnesses, resolve

evidentiary conflicts, and draw reasonable inferences." *Wilson*, 879 F.3d at 802 (citation omitted). For that reason, "[o]verturning the jury's determination on" Krasilovsky's credibility "would require the . . . exacting and rare determination that his testimony was incredible as a matter of law." *United States v. Conley*, 875 F.3d 391, 400 (7th Cir. 2017) (citing *United States v. Hayes*, 236 F.3d 891, 896 (7th Cir. 2001)). Such a rare determination "is usually reserved for extreme situations wherein, for example, 'it would have been physically impossible for the witness to observe what he described, or it was impossible under the laws of nature for those events to have occurred at all.'" *Id.* (quoting *Hayes*, 236 F.3d at 896); *see also United States v. Bailey*, 510 F.3d 726, 733–34 (7th Cir. 2007). The evidence in this case does not present such a rare situation.

A small "barbeque" in the winter does not defy the laws of nature, and the purported inconsistencies in Krasilovsky's testimony that Friedman identifies do not make the testimony incredible as a matter of law either. *Accord United States v. Griffin*, 194 F.3d 808, 818 (7th Cir. 1999). Friedman, in fact, extensively cross-examined Krasilovsky on these matters and argued them to the jury. The Court also instructed the jury to consider Krasilovsky's immunized testimony with "caution and care." Yet the jury still found against Friedman. *See United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008). The Court, accordingly, will not "second-guess" the jury's determination. *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Jarrett*, 447 F.3d 520, 530 (7th Cir. 2006) ("a trial judge does not sit as a 13th juror to evaluate the credibility of a witness").

Moreover, Krasilovsky's testimony was consistent with Bilis's and the documentary evidence admitted at trial. The evidence is sufficient to sustain Friedman's convictions on Counts 3 and 4.

**B.     The Government Presented Sufficient Evidence to Convict on Count 5**

Friedman also submits that there was insufficient evidence to convict on Count 5, relating to a fraudulent loan in Blekhman's name.  Friedman argues that because Blekhman did not testify, there was no evidence that Blekhman did not in fact take out the loan.  He further contends that, although Prestige had previously taken money for the same underlying vehicle—a Porsche Panamera—from two others before shipping it overseas, the car could have returned to the United States or, maybe, Blekhman sent it overseas.

The government produced enough evidence for a rational trier of fact to convict Friedman on Count 5.  In addition to the already-explained evidence of Friedman's participation in the scheme, the government demonstrated through records that the Porsche had left the country more than two weeks before Prestige sought the loan from American Eagle Bank.  This evidence was consistent with Friedman and Bilis's scheme, to bilk the banks using cars that had already been shipped overseas.  The government also elicited testimony from Podolny that he had paid for the Porsche, which is inconsistent with a bona fide sale to Blekhman.  In response to that point, Friedman contorts the record, arguing that Podolny's interest "was extinguished" by an arrangement with Bilis to take other cars.  (R. 136 at 4.)  Friedman did not elicit from Podolny when this "arrangement" took place (*i.e.*, before or after the Blekhman loan), let alone establish that it "extinguished" a legal right.  Further, the Court must view the record in the light most favorable to the government.  What is more, Friedman stipulated to the admission of a letter from Prestige (signed by Bilis) to American Eagle Bank *admitting* that Blekhman never received the Porsche.[3]  Still more, the government demonstrated through records that Prestige made monthly

---

[3] Friedman protests the government's reliance on this letter, arguing that it is hearsay and that it was included in the record in violation of an understanding with the government.  Again, however, he stipulated to its admission.  Parties can waive hearsay objections through stipulations, and a stipulation is

payments on the loan.  This fact, too, supported a finding of fraud in light of the record.

Friedman nevertheless contends that there was "no evidence" that Blekhman did not make the purchase, but what he means is that there is "no smoking-gun evidence" of that fact. Even if that were true, the just-described circumstantial evidence more than sufficed.  *See, e.g.*, *United States v. Shorter*, 874 F.3d 969, 978–79 (7th Cir. 2017) (holding that "powerful circumstantial evidence" sufficed to sustain a conviction); *United States v. Garcia*, 754 F.3d 460, 470 (7th Cir. 2014) ("The evidence is circumstantial, but there is nothing wrong with circumstantial evidence."); *United States v. Thomas*, 763 F.3d 689, 693 (7th Cir. 2014) ("direct evidence is not required to find an element of a crime beyond a reasonable doubt"); *cf. Wilson*, 879 F.3d at 802.  Prestige sold the car to another customer and then shipped it overseas before sending a loan request in Blekhman's name to American Eagle Bank, and Prestige then went on to make the loan payments for Blekhman.  A rational trier of fact could have found Friedman guilty on Count 5.

## II.     The Court Denies Friedman's Motion for a New Trial Under Rule 33

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a); *see also, e.g.*, *Conley*, 875 F.3d at 399.  "[C]ourts have interpreted [Rule 33] to require a new trial in the interests of justice in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial."  *United States v. Eberhart*, 388 F.3d

---

"binding unless it creates 'manifest injustice' . . . or was made inadvertently or on the basis of a legal or factual error."  *Pittman by Hamilton v. Cty. of Madison, Illinois*, 863 F.3d 734, 736 (7th Cir. 2017); *see also, e.g.*, *United States v. Gonzalez*, 142 F. Supp. 2d 1052, 1057 (N.D. Ill. 2001).  Although Friedman confesses counsel's error, he does not cite any manifest injustice or mistake in the law or facts.  In any event, the there is substantial evidence even without considering the letter for the reasons explained in the text.

1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)),

*overruled on other grounds*, 546 U.S. 12 (2005). "[T]he exercise of power conferred

by Rule 33 is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d

1113, 1122 (7th Cir. 2016) (citing *United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990),

*amended* 910 F.2d 467 (7th Cir. 1990)).

### A. Friedman Has Not Made Out a Constitutional Deprivation Claim Resulting From Steinback's Purported Conflict

The first argument of Friedman's motion for a new trial is a repackaging of his

previously denied motion to dismiss. (*See* R. 84; R. 107.) As noted above, Jeffrey Steinback

represented both Friedman and Bilis when their scheme first began to unravel and well before

this federal case began. Friedman soon obtained his own lawyer and Steinback continued to

represent Bilis, who went on to plead guilty and cooperate with the government. Friedman

believes this created a conflict for Steinback, which "taint[ed]" his prosecution in violation of his

constitutional rights. (R. 84 at 17; R. 124 at 10.)

To address Friedman's concerns, the Court received and reviewed evidence Friedman

submitted *ex parte* concerning his attorney-client relationship with Steinback. The Court also

held an evidentiary hearing into the matter, in which both Steinback and Friedman testified.[4]

With the government's consent, the Court held part of the hearing in a closed courtroom with

---

[4] An evidentiary hearing on a motion to dismiss is unusual, but it was to Friedman's advantage. Typically, a defendant files a motion to dismiss under Federal Rule of Criminal Procedure 12. Such a motion generally requires the Court to construe the facts in the light most favorable to the government. *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999) ("We must view all facts in the light most favorable to the government on a motion to dismiss"). Friedman did not file under Rule 12, nor did he substantiate his briefs' factual assertions with evidence. Consistent with the Seventh Circuit's decision in *United States v. White*, 879 F.2d 1509 (7th Cir. 1989) (*White I*), the Court decided that an evidentiary hearing was appropriate to resolve the parties' factual disputes and to assess the merits of Friedman's motion.

only Friedman and his counsel present, so as to allow Steinback to testify to potentially privileged discussions and permit Friedman to cross-examine him on those discussions. After the hearing, the Court further received and reviewed *ex parte* and *in camera* Steinback's client-matter file with Bilis's and Friedman's permission.

For reasons detailed at length in the April Opinion, the Court denied Friedman's motion to dismiss. (*See generally* R. 107.) First, given that Friedman's motion to dismiss relied primarily on Sixth Amendment ineffective-assistance law, the Court addressed whether he could advance such a claim. The Court concluded that he could not, because conflict-free lawyers have represented him since these proceedings began and he has no standing to advance another's (namely, Bilis's) supposed ineffective-assistance claim based on Steinback's purported conflict. (*Id.* at 11–14.) Second, the Court addressed whether Friedman had a meritorious due process, right-to-fair-trial claim. The Court ruled that he did not, because there was no indication that Steinback's supposed conflict prejudiced him. (*Id.* at 14–19.) Friedman testified that he shared personal confidences with Steinback, but the Court found that testimony not credible. (*Id.* at 9–10.) Regardless, however, Steinback's uncontroverted testimony showed that he never shared any information he received from Friedman individually with Bilis. Thus, there was no evidence that the government could have obtained—let alone did obtain—information in violation of Friedman's privilege with Steinback.

Friedman again raises Steinback's supposed conflict in his motion for a new trial. The Court denies this motion, too, largely for the reasons explained in the April Opinion (which the Court incorporates here). The Court adds the following analysis to address Friedman's new and reframed points of contention.

### 1. Friedman Provides No Convincing Reason and No Law to Justify Revisiting the Court's Previous Factual Findings and Credibility Determinations

Starting with the facts, Friedman challenges the Court's prior findings: (1) that Friedman did not share individual confidences with Steinback, and (2) that Steinback did not share information (confidential or otherwise) he received solely from Friedman with Bilis. As noted, in making these findings, the Court credited Steinback's testimony in part and did not credit Friedman's in part. A district court, when acting as fact-finder after an evidentiary hearing, has wide discretion in making credibility determinations. *See Gant v. United States*, 627 F.3d 677, 681 (7th Cir. 2010) ("a district court's credibility findings are entitled to 'exceptional deference' and should be overturned only when they are clearly erroneous"); *Tezak v. United States*, 256 F.3d 702, 715 (7th Cir. 2001) ("we accord the district court's credibility findings exceptional deference . . . and those findings can virtually never be clear error") (citation and quotation omitted); *see also United States v. Austin*, 806 F.3d 425, 431 (7th Cir. 2015) ("Determining witness credibility is especially within the province of the district court and can virtually never be clear error.") (citation and quotation omitted).

As explained in the April Opinion, the Court did not credit Friedman's testimony that he shared individual confidences with Steinback for numerous reasons. The notion that an individual concerned with his personal legal jeopardy would enter into joint representation, but want personal advice, yet rely exclusively on his co-client's unpredictable restroom breaks to seek such advice, is implausible. The fact of that type of communication, despite being obviously important to Friedman's theory, only came out during the government's cross-

examination.[5]  Even then, Friedman's story was evolving, first asserting that he kept talking to Steinback during Bilis's restroom breaks to fill the time and because Steinback was expensive, then saying that he did it because he wanted to tell Steinback things that he did not want Bilis to hear.  The Court also found Friedman evasive, both in his demeanor and his answers.  He, for example, denied confessing to the banks with Bilis, but when pressed essentially admitted that he and Bilis told the banks that they had opened loans for cars they did not have.

In addition, the Court credited Steinback's testimony in part.  Steinback testified that he never received any admissions from Friedman during his relatively brief joint representation.  He also testified that he "absolutely" never shared any information (again, confidential or otherwise) that he received from Friedman to Bilis, which neither Friedman's testimony nor any other evidence contradicted.[6]  He further testified that Friedman never admitted wrongdoing to him. To be sure, as Friedman stresses, Steinback's testimony was inconsistent in certain respects. After testifying, Steinback recanted (via a voicemail to the government) where his first meeting with Bilis and Friedman occurred.  The venue of the meeting, however, was immaterial to the substance of meeting and, more precisely, to whether Friedman shared confidences or admissions with Steinback.  Steinback also allowed for the possibility that he could have been wrong while on the stand, saying it was "possible" that he had met Bilis and Friedman in Rockford, Illinois.  Moreover, Steinback, unlike Friedman, was plainly forthcoming, even

---

[5] The Court assumes that Friedman could have had an individual attorney-client privilege with Steinback that would have protected Friedman's individual confidences from Bilis.  That notion, though, is doubtful, because all agree that Steinback represented Bilis and Friedman jointly.  *See* 1 Kenneth S. Broun et al., MCCORMICK ON EVIDENCE § 91.1 at 335–36 (7th ed.).

[6] Friedman argues that, regardless of his testimony's believability, he must have shared confidences with Steinback because Steinback testified that he never passed along information received from Friedman to Bilis.  (R. 124 at 8 n.4.)  That argument misconstrues Steinback's testimony, and assumes all information shared with a lawyer is confidential (or more specifically, privileged), which it is not.  *E.g.*, *United States v. White*, 970 F.2d 328, 334 (7th Cir. 1992) (*White III*).

expressing regret at the thought of having done something harmful to a former client. The Court also reviewed Steinback's client file for the matter *ex parte* and *in camera* and it did not contain any individual confidences shared by Friedman with Steinback, which supported Steinback's testimony.

Friedman's arguments criticizing the Court's findings are unsupported by law, and he simply (and predictably) plays up Steinback's testimonial shortcomings while downplaying his own. The Court, however, was the "best situated to make credibility determinations in light of the totality of the evidence, including the witness's statements and behavior, other witness statements, and further corroborating or contrary evidence." *Austin*, 806 F.3d at 431. Faced with two conflicting witnesses, the Court determined whose account was more credible and likely in light of their testimony, demeanor, and the evidence produced. The Court therefore will not revisit its previous factual findings.

### 2. Friedman Has Not Shown a Constitutional Deprivation Resulting From Steinback's Purported Conflict

Turning to the law, Friedman's previous and current requests are exceptional—for a dismissal of the indictment and for an overturning of a jury verdict, respectively. *E.g.*, *United States v. Morrison*, 449 U.S. 361, 365 (1981); *Santos*, 20 F.3d at 285. Yet he argues, at best, a constitutionally vague claim. Friedman's due process argument relies almost exclusively on ineffective-assistance and attorney-disqualification case law, and he argues that the fact of Steinback's purported conflict—regardless of its actual consequences—violates his rights and warrants a new trial.

As explained in the April Opinion, and as Friedman has conceded, the due process concern implicated by these facts is whether Steinback's work with the prosecution (via Bilis's

cooperation) tainted the prosecution with Friedman's legally protected confidences.[7] (*See* R. 107 at 15.) Courts confronted with this question have not held, as Friedman advocates, that prejudice is presumed. Rather, they have held that the defendant must show, among other things, that the government received privileged information such that there could be prejudice (as explained at length in the April Opinion (*id.* at 15–18)). To take just one example here, in *United States v. White*, 950 F.2d 426, 430–32 (7th Cir. 1991) (*White II*), the Seventh Circuit rejected a defendant's claim that his ex-lawyer's cooperation with the prosecution violated his due process rights because the defendant could not establish that the prosecution received privileged information.[8] *See also White I*, 879 F.2d at 1513–14; *White III*, 970 F.2d at 334–36 (7th Cir. 1992); *accord U.S. ex rel. Shiflet v. Lane*, 815 F.2d 457, 466 (7th Cir. 1987); *accord United States v. Olson*, 450 F.3d 655, 678 (7th Cir. 2006). Similarly, here, there is no evidence of shared privileged information.

Friedman attempts to distinguish the *White* decisions and others (*see* R. 107 at 15–18), but his arguments are unpersuasive. He argues, for example, that in *White III* the Seventh Circuit held that the information the lawyer shared was not privileged because the court held that the client intended the information to be made public. That is true, and irrelevant. The point is that the *White* decisions require evidence that the government has received privileged information for there to be a due process violation. *White III*, 970 F.2d at 334–35. (They in fact go further, holding that a claim may exist only where the government was "complicit" in the breach and that

---

[7] Friedman, notably, has never claimed that Steinback's representation of a cooperator violates his Fifth Amendment right against self-incrimination.

[8] For a more thorough explanation of the *White* decisions, see the April Order. Also, it is questionable whether this could even give rise to a due process claim, as the *White* decisions assume, because the Seventh Circuit has since made clear its disavowal of "outrageous governmental conduct" claims. *United States v. Smith*, 792 F.3d 760, 765 (7th Cir. 2015). The Court, however, assumes that the use of privileged confidences against a defendant constitutes a due process violation.

the defendant was "prejudice[d]." *Id.* at 335–36.)  Friedman also contends that in *White* the defendant's ex-lawyer cooperated himself, whereas here Steinback counseled Bilis in cooperating.  That is a factual difference, but not a legal distinction.[9]  In either event, the concern is whether privileged information infected the prosecution.  The *White* decisions hold that such conduct may give rise to a due process violation, but there must be evidence of it.  *Id.* at 334–336; *White II*, 950 at 430–32; *White I*, 879 F.2d at 1513–14.

Friedman also calls it unfair to require evidence of a privilege breach, citing concerns about his and Bilis's respective privileges with Steinback and his own right against self-incrimination.  As an initial matter, those concerns ring hollow.  The Court's orders and the evidentiary hearing showed that the Court accepted evidence *ex parte* and *in camera*.  (*See, e.g.*, R. 95.)  Indeed, Friedman did not object to submitting *ex parte* privileged evidence of his joint representation (*see* R. 99), he readily cross-examined Steinback in a closed courtroom during the hearing, and, with Bilis's consent, he agreed that the Court should review Steinback's client file *ex parte* and *in camera*.  As Friedman's own conduct shows, there is nothing objectionable about using *ex parte* or *in camera* procedures; courts and litigants frequently rely on them to protect privileges and defendants' rights.  More importantly, *White I* addressed Friedman's concerns.  It called for the district court to review the allegedly privileged information the lawyer shared with the government *in camera* in assessing whether a due process violation occurred.  *White I*, 879 F.2d at 1514.  That is what the Court welcomed here.  To be sure, Bilis's attorney-client privilege with Steinback could have stood in the way of Friedman revealing direct evidence of

---

[9] Friedman, for example, claims that Steinback could have used his supposedly privileged understanding of Friedman's role in the offense to shape Bilis's cooperation to better disadvantage Friedman.  But that concern would be doubly true if Steinback were himself the government's cooperator, like in the *White* decisions.  He could shape his own cooperation accordingly.

disclosed privileges if they existed (though perhaps not on this record, given Bilis's consent to permit review of Steinback's client file and his cooperation). But Friedman had ample opportunity to demonstrate whatever supposed confidences he shared with Steinback *and* ample opportunity to review and inquire further into what information Bilis shared with the government. Still, he was unable to raise even the specter of disclosed privileges.

Friedman eschews the framework established by the *White* decisions and others and asks the Court to create a "bright-line rule" that would require dismissal or the overturning of a jury verdict whenever a lawyer represents a witness in cooperating against a former client regarding matters similar to the initial representation. (R. 124 at 12.) Friedman supports that request by stretching together two lines of cases, neither of which concern his due process claim.

First, Friedman cites Sixth Amendment case law regarding ineffective assistance of counsel and, specifically, the presumed assistance-related prejudice to a defendant represented by an actually conflicted lawyer. (*See, e.g.*, R. 124 at 10 (citing *Holloway v. Arkansas*, 435 U.S. 475 (1978).) As explained in the April Opinion, even if Steinback's purported conflict created prejudice under the Sixth Amendment, it is not prejudice that Friedman suffers. (R. 107 at 12–14.) Conflict-free counsel has represented Friedman throughout these proceedings. Friedman hangs on to this line of cases, but seems to acknowledge that they do not support his claim. (R. 124 at 9 (Friedman noting that "perhaps" his motion-to-dismiss claim "was not articulated as clearly as it should have been" and that he "was not arguing the classic Sixth Amendment conflict of interest.").)

Second, Friedman cites cases in which a party has moved to disqualify another party's counsel on the basis of a prior representation. (*See, e.g.*, R. 124 at 10 (citing *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 224 (7th Cir. 1978); *United States v. Basham*, 918 F.

Supp. 2d 787 (C.D. Ill. 2013)).)  In such cases, courts often presume that an earlier-represented client shared confidences with counsel such that disqualification is needed so as to not unfairly disadvantage another party.  Friedman, however, has not filed a motion to disqualify Steinback; he has filed a motion for a new trial, and previously a motion to dismiss the indictment.  Nothing in the attorney-disqualification canon justifies the drastic remedies Friedman seeks.  But even if the presumption of shared confidences applies here, it does not aid Friedman's due process claim.  Steinback initially represented Bilis and Freidman jointly.  To the extent the law calls for a presumption, it is one of joint confidences, not Friedman-specific admissions.  *See Rocchigiani v. World Boxing Counsel*, 82 F. Supp. 2d 182, 188–89 (S.D.N.Y. 2000) (the presumption is inapposite "where the prior representation by the attorney in question was within the context of a joint representation" because "the former client could not reasonably expect confidences imparted to the attorney during the course of the joint representation to be withheld from the other client"); *see also* MCCORMICK ON EVIDENCE § 91.1 at 335–36 (regarding joint representation, a "communicating client, knowing that the attorney represents the other party also, would not ordinarily intend that the facts communicated should be kept secret from him").

Finally, Friedman requests that the Court order a new trial and bar Bilis's testimony in the interests of the legal profession.  The Court declines to do so.  Friedman provides no law holding that a court can disqualify a witness (as opposed to a party's counsel) on these grounds.  Friedman, also, has not demonstrated anything that would cast doubt on the fairness of the trial.  *Cf. Wheat v. United States*, 486 U.S. 153, 160 (1988).  He initially choose joint representation by Steinback, and he did not testify that Steinback failed to warn him of the dangers of such representation (as Steinback testified was his practice).  The representation was early-on and brief, and, as explained above, no credible testimony or other proof indicates that Friedman

shared individual confidences with Steinback.

Ultimately, Friedman asks the Court to create new law and extend due process protections where no court has before. The Court declines to do so. Friedman's frustration or disappointment with Steinback's conduct does not give rise to a constitutional violation.

### B. The Government's Closing Arguments Neither Shifted Nor Minimized Its Burden

Friedman also requests a new trial based on the government's rebuttal closing which, according to Friedman, changed the juror's impression of the applicable burden of proof. Specifically, he contends that: (1) the government's reference to Friedman's subpoena power with respect to two potential witnesses shifted the burden to him, and (2) the government's urging of the jurors to "go with [their] gut" minimized its burden. The Court disagrees.[10]

First, during closing arguments Friedman's counsel criticized the government for not calling a handwriting expert, who could have confirmed (or denied) that Friedman signed certain loan documents or checks, and for not calling Yuri Fiskin, the finance manager who signed several of the same types of documents. In rebuttal, the government emphasized that it carried the burden of proof, but that Friedman, too, had subpoena power and could have called either a handwriting expert or Fiskin. That was appropriate rebuttal argument given counsel's comments. The law is clear: "[A]s long as it is clear to jurors that the government carries the burden of proof, the prosecutor may tell the jury that a defendant has the power to subpoena witnesses." *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016) (quoting *United States v. Miller*, 276 F.3d 370, 374–75 (7th Cir. 2002)). Where, as here, "the defendant himself has broached the subject of missing witnesses by asking the jury to in a sense penalize the

---

[10] The Court incorporates its oral ruling on this issue and all other rulings relevant to Friedman's motion.

government for its failure to produce" witnesses, the prosecution may respond by citing the fact

of the defendant's subpoena power. *Id.* (quoting *United States v. King*, 150 F.3d 644, 649 (7th

Cir. 1998)); *see also United States v. Jones*, 188 F.3d 773, 779 (7th Cir. 1999); *cf. United States

v. Cochran*, 955 F.2d 1116, 1122 (7th Cir. 1992) (affirming the district court's refusal to allow

comment on the absence of government witnesses during closing arguments where the defendant

"could have issued subpoenas to both 'missing witnesses'").

With respect to a handwriting expert, Friedman contends that the government's response

was nevertheless improper because there was no existing handwriting expert. That does not

make one unavailable to him, though. To the extent Friedman's argument is that the rule

permitting the government to comment on a defendant's subpoena power applies only when

there is a known and readily identifiable missing witness, that is not the law. *See Jones*, 188

F.3d at 779 (prosecutor's comment regarding missing defense expert was proper).[11] All that the

"prosecutor asked for [was] an inference, which does not alter the burden of proof." *United

States v. Sblendorio*, 830 F.2d 1382, 1394 (7th Cir. 1987).

With respect to Fiskin, Friedman argues that he could not have called him to testify

because he was in the government's control. While Friedman points to potentially incriminating

facts for Fiskin—namely, his signature on many of the fraud-related documents—Friedman has

not demonstrated that he was effectively under the government's control. Friedman cites no case

supporting the sweeping proposition that any witness who could potentially implicate himself is

under the government's control. *Accord United States v. Toma*, No. 94 CR 333-18, 1997 WL

665867, at *2 (N.D. Ill. Oct. 21, 1997) ("That the government did not grant her immunity so she

---

[11] Friedman's attempt to distinguish *Jones* is unpersuasive. After all, the government bears the burden in
establishing every element of the offense beyond a doubt. It makes little sense to permit the government
to comment on missing eye witnesses but not expert witnesses.

could testify is no basis for finding the government had control over her for purposes of giving a missing witness instruction.").  Moreover, although Friedman complains that Fiskin stopped returning his calls, he does not claim that he attempted to subpoena Fiskin or that Fiskin informed him of an intent to invoke his Fifth Amendment privilege.  *Accord United States v. Foster*, 701 F.3d 1142, 1156 (7th Cir. 2012) (affirming decision not to give a missing-witness instruction despite the fact that the witness would have incriminated himself because requiring such an instruction "each time the prosecution decides not to immunize a witness would constitute a substantial judicial encroachment upon prosecutorial discretion") (quoting *United States v. Flomenhoft*, 714 F.2d 708, 714 (7th Cir. 1983)); *United States v. Gant*, 396 F.3d 906, 910 (7th Cir. 2005) ("Gant asserts that an individual is more likely to respond to a summons from the government than from a criminal defendant.  He has not contended, however, that he attempted to subpoena Motley as a witness nor has he offered a satisfactory explanation for failing to do so.").

Second, the government, again while emphasizing that it bore the burden of proof, asked the jury to use its "gut" in evaluating the evidence during its rebuttal closing.  This was not an improper argument.  *See United States v. Boesen*, 541 F.3d 838, 845–46 (8th Cir. 2008) (government's comments about using one's "gut" were not improper in light of context).  The government used that phrase synonymously with "common sense," which a jury can of course consider.  *United States v. Durham*, 211 F.3d 437, 441–42 (7th Cir. 2000).  Indeed, the Court instructed the jury to use its common sense.  (R. 118 at 5.)  The government asked the jury, for example, to "look at the evidence and your gut, your common sense."  It later told the jurors to "use your common sense, check your gut, ask yourself" why a particular person would have testified as they did.  Unlike the comments referenced in the cases upon which Friedman relies,

*United States v. Hernandez*, 176 F.3d 719, 728–31 (3d Cir. 1999); *State v. Schnabel*, 279 P.3d 1237, 1257 (Haw. 2012), the government did not suggest that the jury should skip a careful evaluation of the evidence presented. It encouraged them to do just that, but added that they should use their "gut" or their "common sense" too. Friedman's arguments to the contrary— claiming, for example, that "common sense was never discussed" (R. 124 at 19 n.12; *see also* R. 136 at 14)—simply misconstrue the record.

None of the government's closing arguments unfairly prejudiced Friedman. The government repeatedly told the jury that it bore the burden of proof, and the Court instructed the jury of that fact. *See Flournoy*, 842 F.3d at 528; *United States v. Dillard*, 884 F.3d 758, 769 (7th Cir. 2018) (there is a "general presumption that jurors follow the court's instructions"). As such, this basis for relief fails.

## C. The Court's Trial Rulings on Impeachment Were Not Improper

Friedman next submits that a new trial is required because the Court barred him from impeaching Igor Nemov and Stanislav Podolny with Lt. Anderson's testimony. Federal Rule of Evidence 613 permits "[e]xtrinsic evidence of a witness's prior inconsistent statement . . . if the witness is given an opportunity to explain or deny the statement . . ." FED. R. EVID. 613(b). Courts interpret this rule "broadly." *United States v. Lopez*, 870 F.3d 573, 582 (7th Cir. 2017); *see United States v. DeMarco*, 784 F.3d 388, 394 (7th Cir. 2015). It is "well-established that 'two statements need not be diametrically opposed to be inconsistent.'" *United States v. Smith*, 831 F.3d 793, 800–801 (7th Cir. 2016) (quoting *United States v. Vasquez*, 635 F.3d 889, 898 (7th Cir. 2011)). Determining whether a prior statement is "inconsistent" with trial testimony is generally within the discretion of the district court. *United States v. Gajo*, 290 F.3d 922, 931 (7th Cir. 2002) ("we believe that the district court is in a better position to evaluate the 'multitude

of factors' that help determine whether a witness's trial testimony is truly inconsistent with his or her prior grand jury testimony"); *see also Grunewald v. United States*, 353 U.S. 391, 423 (1957) ("[T]he question whether a prior statement is sufficiently inconsistent to be allowed to go to the jury on the question of credibility is usually within the discretion of the trial judge").

The information Friedman sought to elicit from Lt. Anderson was not inconsistent with Nemov and Podolny's trial testimony. Nemov testified that at different times in 2011 he went to Prestige to speak with Bilis and Friedman about the lot's missing cars. According to a report written by Lt. Anderson, however, Nemov made no mention of speaking to Friedman specifically in 2011. On cross-examination, and after reviewing the report, Nemov explained that he could not recall what he told Lt. Anderson seven years ago. In the Rule 801(d)(1)(A) context (which allows for the admission of previous "inconsistent" testimony as non-hearsay) courts have noted that a "lack of memory" can give rise to an inconsistency, but they have done so in the context of "recalcitrant witness[es]" who previously gave "specific details." *Gajo*, 290 F.3d at 931; *see also United States v. Cooper*, 767 F.3d 721, 728 (7th Cir. 2014); *United States v. DiCaro*, 772 F.2d 1314, 1322 (7th Cir. 1985). Under Rule 613(b), "[w]here a witness in good faith asserts that she cannot remember the relevant events, the trial court may, in its discretion, exclude the allegedly prior inconsistent statement." *United States v. Brown*, 788 F.3d 830, 834 (8th Cir. 2015) (citation and quotation omitted); *see also* 28 WRIGHT & GOLD, FEDERAL PRACTICE & PROCEDURE § 6203 (2d ed. 2012) ("courts frequently have found no inconsistency" based on mere failures to remember "since it is clear that memory can erode over time"). The latter is what occurred here. Nemov was neither evasive nor recalcitrant, and his testimony suggested only a good-faith memory lapse.

The same is true of Podolny's trial testimony. He testified that he did not remember Bilis

coming to Elite Motors (Podolny's dealership) to sell him a Porsche, and that he did not recall telling Lt. Anderson that Bilis had done so. That testimony does not present an impeachment-worthy inconsistency. Podolny noted that almost seven years had passed since the events in question, explained that he could not even recall speaking with Lt. Anderson, and readily testified that he primarily conducted business with Bilis, not Friedman.

Regardless, Friedman makes little effort to show how he was prejudiced by not being able to attempt to impeach Nemov and Podolny with Lt. Anderson's testimony. Indeed, Nemov's supposed "inconsistency . . . was put on full display for the jury through repeated questions during his cross-examination." *Lopez*, 870 F.3d at 582; *see also United States v. Vega*, 826 F.3d 514, 538 (D.C. Cir. 2016) (denial of impeachment evidence "was harmless given that any perceived contradiction between the contents of the report and the . . . testimony was fully aired for the jury during cross-examination"). Friedman's cross-examinations, moreover, put Nemov's and Podolny's credibility squarely before the jury by rigorously questioning whether their resentment for Friedman motivated their testimony. *See, e.g.*, *United States v. Hemsher*, 895 F.3d 525, 532 (8th Cir. 2018). Neither Nemov nor Podolny was central to the government's case, and there was more than enough evidence for the jury to find Friedman guilty on each count it did for the reasons explained above.

### D. The Court Did Not Improperly Admit Hearsay Evidence

Finally, Friedman seeks a new trial on the ground that the Court allowed inadmissible hearsay testimony. Alina Sandal, Prestige's accounts-payable manager, testified to creating monthly financial statements that reflected profits and losses. She testified that Friedman received and reviewed those statements. During trial, as Sandal generally described the types of financial information listed on those statements, Friedman's counsel objected on best-evidence

and hearsay grounds. The Court denied those objections based on the question asked, but told Friedman that if he had related hearsay objections as Sandal's testimony progressed he should make them. Sandal went on to testify that, around 2010, she began to notice that the financial statements showed that Prestige was losing money. Friedman did not object. On cross-examination, he did not question Sandal about her testimony regarding what the statements showed.

Friedman argues that Sandal's testimony related to the statements was hearsay.[12] Friedman does not argue that the statements Sandal described were not business records (and he did not object on that basis at trial). Sandal, in fact, testified that she regularly created and maintained the statements in the normal course of Prestige's business. *See* FED. R. EVID. 803(6). Instead, Friedman contends that Sandal's description of the statements constituted hearsay because the statements were not in evidence. Even so, Sandal's testimony was not hearsay. Her testimony did not go to the truth of the statements' contents. To the contrary, Sandal's description of the statements showed what type of financial information Friedman received and reviewed—a fact directly relevant to his knowledge and culpability. To the extent Sandal's testimony regarding the poor financial condition of the company reflected in the statements is a separate ground for Friedman's hearsay argument, it is waived. He did not object to that testimony at trial (despite being instructed to if he had further hearsay objections) and he did not cross-examine Sandal about it. *See United States v. Ridley*, 826 F.3d 437, 443 n.1 (7th Cir. 2016) (intentional decisions not to object amount to waiver).

---

[12] Friedman does not raise a best-evidence argument. *See Waterloo Furniture Components, Ltd. v. Haworth, Inc.*, 467 F.3d 641, 648–49 (7th Cir. 2006) ("If a witness's testimony is based on his first-hand knowledge of an event as opposed to his knowledge of the document . . . then Rule 1002 does not apply").

Again, however, even if Sandal's testimony was hearsay, Friedman has not even attempted to show prejudice. Indeed, Bilis independently testified that Friedman reviewed Prestige's financials and that the company's finances suffered increasingly toward the end of its business.

## CONCLUSION

For the foregoing reasons, the Court denies Friedman's motions for acquittal and for a new trial.

**DATED:  July 18, 2018**                    **ENTERED**

_____

**AMY J. ST. EVE**
**United States Circuit Court Judge**
**Sitting by Designation**